[Crim. No. 1318. Fourth Dist. July 25, 1957.]

THE PEOPLE, Respondent, v. EARL BENJAMIN
NAZWORTH, Appellant.

Edgar G. Langford and J. Perry Langford for Appellant.

Edmund G. Brown, Attorney General, and Carl Boronkay, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendant was charged with the crime of rape (Pen. Code, § 261, subd. 3) in that on or about the 9th day of September, 1956, in the county of San Diego, he did then and there wilfully, unlawfully, feloniously, and with force and violence have and accomplish an act of sexual intercourse with and upon one Hazel Ethel Nazworth. The information also contained an allegation that said defendant had been previously convicted of a felony and had served a term of imprisonment therefor in the United States Penitentiary at McNeil Island. Defendant entered a plea of not guilty and admitted the prior conviction. A jury trial was had and a verdict was returned finding him guilty of rape as charged in the information. His application for probation and motion for new trial were denied and he was sentenced to the state's prison.

Hazel Ethel Nazworth, the complaining witness, was 19 years of age at the times here involved and was employed as a telephone operator in the city of San Diego. Defendant was a carpenter and lived with his wife and three children in San Diego. He was a cousin of the complaining witness. On September 8, 1956, at approximately 9 p.m., Hazel called her home from the telephone office where she was employed and told her mother she would be home late; that she was going to wait for a girl friend and ride home with her on the bus. The defendant was at Hazel's home at the time and heard her mother say Hazel was going to wait until 9:30; that Joan Baldwin wanted her to walk from the telephone company to the bus line with her. After a conversation with Hazel's father, defendant backed his car out of the driveway and departed.

Hazel and her girl friend, Joan, boarded the bus after Joan had left work and Joan got off the bus near her home. The girls had agreed to dine together that evening. Joan was

to go home, change clothes, get her father's car and pick up Hazel at her home. Later that evening she drove to Hazel's home but she was not there.

Hazel left the bus near her home at about 10 p.m., crossed the street and had started walking toward her home when she noticed a car parked on the street corner. Defendant got out of this car and came up to her. He said, "Let's go get something to eat." Hazel stated that she had to go home. She testified that they were standing near a picket fence at that time and defendant said he would smash her face through the fence if she did not go with him; that she told him she knew he would because she knew of two other girls he had "beat up"; that defendant grabbed her and shook her and when she attempted to get away, he held her by the arm and twisted it; that he pushed her over to the car, opened the door and pushed her in and told her to drive; that she drove the car where he directed because she was "scared of him"; that after driving a short distance, she stopped the car and tried to get out but the defendant told her that he "could run faster, so I better not try getting out"; that the defendant tried to kiss her and she "beat against his chest"; that he moved into the driver's seat, holding her arm, and then drove to a desolate area on Mt. Soledad, where he turned off on one of the roads; that he stopped the car, tried to kiss her and touch her breasts; that she told him to leave her alone and resisted his advances; that he then said he had been thinking about it for a long time and nothing was going to stop him; that he told her to take off her clothes but she refused and was crying and asked to be taken home; that the defendant then got into the back seat of the car and said he would give her to the count of five to get back there; that she was very much afraid of him but did not move from the front seat; that defendant then got back into the front seat and choked her with his hands so that she had difficulty in breathing and could not speak for a couple of minutes; that defendant then pushed her down on the seat and had sexual intercourse with her, without her consent and over her resistance; that about 15 minutes later defendant drove down the hill to a drive-in and then drove to her home, where she saw her father standing on the front lawn; that defendant then drove to two other eating places and then to Friar's Road to a desolate area and stopped the car; that he then said, "I am going to do it again," or words to that effect; that she said "No" and struggled with him and cried; that defendant then pushed her

down on the car and had sexual intercourse with her, without her consent and overcoming her resistance; that defendant then drove to the east San Diego area and stopped at the home of her girl friend; that Mrs. Knapp, the girl friend's mother, invited her in and helped her to a chair. She was hysterical and seemed to be in a state of shock. Her clothes and her hair were "quite messed up," her eyes were swollen and red, her hands were shaking and she was crying. Hazel's parents were then called and her father came and took her home, where her mother observed that she appeared very white, her face and eyes were swollen and she had two red marks on her neck.

A police physician examined Hazel at approximately 4:45 a. m. on September 9, 1956. The examination disclosed lacerations on the hymen and that the material removed from the vagina contained semen and live spermatozoa. The doctor concluded "that she had had sexual intercourse within a period of several hours prior to that time and that this was her first act of sexual intercourse."

Defendant's version of the events on the night of September 8, 1956, and the following morning was that he visited Hazel's parents on the night of September 8th and left at about 9:30 p. m. to see about a building job; that he was returning home when he observed Hazel crossing the street; that he greeted her and she asked him to take her to a drive-in to look for her boy friend; that she remained in the car at the drive-in while he played pool in a café across the street; that later they drove to Mt. Soledad where they voluntarily engaged in an act of sexual intercourse; that later they drove to Hazel's home and she observed her father and told him (defendant) not to stop; that they then went to a drive-in where he purchased and ate some food; that Hazel did not want to go home because she was afraid of her father and indicated that she wanted to be taken to her girl friend's house; that he drove on Friar's Road, stopped the car and they voluntarily engaged in another act of sexual intercourse; that he then drove to the home of Hazel's girl friend, where Hazel knocked at the door and was let in; that he waited until she went into the apartment and drove away.

Counsel for defendant stated in the conclusion in their opening brief that "The issue to be tried in the case at bar should have been simple. If the complaining witness was telling the truth, the defendant was guilty of the type of rape in which the female resisted, but her resistance was overcome

by force. If the defendant was telling the truth, he was innocent of any crime, whatever may be said about his morals.'' However, it is contended that the judgment should be reversed because of claimed errors on the part of the trial court.

The first asserted error is that the court committed prejudicial error in permitting the People to introduce irrelevant evidence of other offenses of the defendant. The record shows in this connection that the prosecutor asked the complaining witness on rebuttal why she had not screamed during the evening, called for help or jumped out of the defendant's car, and she replied that she was afraid of the defendant. She was then asked why she was afraid of him and answered, over objection of counsel, that ''He (defendant) had beat up two other girls''; that she knew he was wanted by the F. B. I. before; that he had knife fights with his father and that he shot her aunt before. The court stated that the complaining witness was entitled to show the state of her mind and that this evidence was received ''only for the purpose of showing her state of mind, not for the truth or falsity of what she testifies to.'' Appellant admits that since the testimony relative to defendant's ''beating up'' of the two other girls had been admitted without objection, he is not now in a position to question the admissibility of such evidence and that the testimony relating to the F. B. I. was probably not prejudicial because the fact of the prior conviction for the federal offense was before the jury. However, his counsel claim that the introduction of testimony that defendant shot the aunt of the complaining witness and had knife fights with his own father was prejudicial error. We are not in accord with this contention. Appellant in his cross-examination of the complaining witness attacked the credibility of her testimony and no prejudicial error resulted from the admission of her statement as to why she was afraid of the defendant. The court instructed the jury as to the limited purpose for which said testimony was received in the following language:

''That evidence was admitted to show the state of mind of the prosecutrix, not to show that the defendant was guilty of those offenses or was guilty of any misconduct, but merely to show what was in her mind at the time and place, so that you may pass upon her conduct at the time in question.'' Under these circumstances no prejudicial error was shown.

 Appellant's next argument is that the trial court erred in its instructions to the jury on the subject of consent

to sexual intercourse given as a result of fear. This argument is not meritorious. The court instructed the jury on this subject as follows:

"The defendant is charged with having committed the crime of rape against the resistance of the female person here involved. This kind of rape, as I have told you, is commonly referred to as forcible rape. Proof of resistance by the female person, therefore, is essential to support a verdict of guilt under this charge. The nature and extent of the resistance necessary to give the act the character of forcible rape depends upon the surrounding circumstances as shown by the evidence.

"The conduct of the female person need only be such as to make non-consent and actual resistance reasonably manifest. The resistance must be proportioned to the outrage and must be judged in the light of all the accompanying facts, such as the relative strength of the parties, the age and the condition of the female person, the uselessness of resistance as it would appear to her, and the degree of force manifested, and what knowledge she had of the defendant's past conduct. She need not resist until either strength or consciousness is gone; her resistance need continue only until it becomes so apparently useless as to warrant its cessation.

"Even when a woman yields in sexual intercourse to a male aggressor, if her yielding has been induced by fear that it is necessary to save her from violence or death or that it offers hope of so doing, her conduct in such circumstances does not constitute consent.

"When any physical penetration occurs, if up to then the conduct of the male has amounted to forcible rape, the crime is complete, and it is wholly immaterial whether thereafter the female person resists or not.

"When a woman yields in sexual intercourse to a male aggressor, if her yielding has been induced by fear that it is necessary to save her from violence or from threats or from death or that it offers hope of so doing, her conduct in such circumstances does not constitute consent."

These instructions do not contain misstatements of the law applicable to the offense charged in the information on the question of the resistance required on the part of the complaining witness and we find no error in this connection.

██ Appellant further contends that the trial court unduly limited the cross-examination of the complaining witness. This argument is likewise without merit. Appellant bases

this contention in the remark made by the court on cross-examination of the complaining witness that "On cross-examination you can't ask the question more than once." This remark was made by the court after counsel had asked the complaining witness repeatedly where the defendant was in the car and the complaining witness had stated that he was sitting on the seat and she did not know what part of the seat. Counsel for defendant then said, "When a witness said 'I don't remember anything' I respectfully submit I have a right to pursue it," and the court then replied as follows: "You have a right to ask the same question again of a witness, and if the witness doesn't remember—you have asked about three times where he was seated and she said she didn't remember. I don't know that it is going to do any good to ask it five times more." The record shows that the court did not in fact prohibit counsel from asking further questions as to the points involved and that reasonable latitude was permitted in the cross-examination of the complaining witness as to all of her testimony. The scope of cross-examination is within the sound discretion of the trial court and its rulings in such matters will not be disturbed on appeal in the absence of a clear abuse of such discretion. *People* v. *Apodaca,* 132 Cal.App.2d 340, 341 [282 P.2d 182].) No abuse of discretion appears in the instant case.

Judgment and order denying motion for new trial affirmed.

Barnard, P. J., and Griffin, J., concurred.